# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 13, 2014 Session

## STATE OF TENNESSEE v. KENNETH MOORE

### Appeal from the Criminal Court for DeKalb County
### No. 2011-CR-196    Leon C. Burns, Jr., Judge

### No. M2013-02022-CCA-R3-CD - Filed July 2, 2014

The defendant, Kenneth Moore, appeals his DeKalb County Criminal Court jury conviction of aggravated sexual battery, claiming that the trial court erred by denying his motions to introduce certain evidence, including evidence offered pursuant to Tennessee Rule of Evidence 412, and that the evidence was insufficient to support his conviction. Discerning no error, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Jason F. Hicks, Cookeville, Tennessee, for the appellant, Kenneth Moore.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall A. York, District Attorney General; and Greg Strong and Amanda Worley, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The DeKalb County Criminal Court charged the defendant with one count of rape of a child, the victim of which was the defendant's 12-year-old niece, K.L.[1] The trial court conducted a jury trial in April 2013.

---

[1]As is the policy of the court, we refer to the minor victim by her initials.

J.M.L.,[2] the victim's mother, testified that she had lived in Crossville since 2006 and that she had two children, the victim and a son, J.L. In 2009, she began experiencing health problems, and her brother, the defendant, offered to let J.M.L. and her children move into his residence in 2010. At that time, the victim was 12 years old, and her brother, J.L., was 14. In describing the sleeping arrangements in the defendant's residence, J.M.L. explained that she had her own bedroom and that her son and the defendant's son shared another bedroom. Adjacent to J.M.L.'s bedroom was a large room shared by the defendant and the victim; J.M.L. testified that the victim's area of the room was separated from the defendant's area by "a sheet and a TV." J.M.L. stated that it was the defendant's idea for the victim to share his room because he had the largest room, and she explained that the victim had her own bed in that room. The victim, however, "mostly" slept in the bed with J.M.L. J.M.L. testified that the entire family, the victim included, would often watch television while seated on the defendant's bed. J.M.L. stated that she trusted the defendant because "[h]e was [her] brother."

In November 2010, J.M.L. was experiencing dental problems and learned of a program where she could undergo her needed dental work free of charge. Sometime near November 15, J.M.L. stood in line overnight to ensure that she would be chosen the following day to receive dental care, and the victim stayed at home with the defendant. The following day, the victim asked her mother if she could stay overnight at a friend's house, and J.M.L. agreed. A day later, the victim told her mother that the defendant had sexually abused her, and J.M.L. accompanied the victim to the sheriff's department to file a complaint against the defendant.

On cross-examination, J.M.L. conceded that the victim had lied to her on previous occasions. J.M.L. stated that it had been the defendant's idea for the victim to set up her bedroom in his room because it was the largest room in the house. J.M.L. allowed it because the victim "slept with me anyways, so I just figured, if she put her bed in there, that's fine, because she slept with me all the time anyways." When questioned again about the victim's lying to her in the past, J.M.L. testified that she asked the victim, "'Are you sure this is what happened? Because this is big. People, a lot of people can get in trouble. Like, [the defendant] could get in trouble really bad for this,'" and the victim responded, "'I'm telling you, Mom, it happened.'"

The victim testified that, in November 2010, she was 12 years of age, and she stated that she "usually slept with [her] mom" while they were living in the defendant's house. On the evening in November when her mother left the house to receive dental work,

_____

[2]To protect the anonymity of the minor victim, we will refer to her mother and brother by their initials.

the victim was at home with the defendant and the defendant's six-month-old granddaughter, and the three of them were lying on the defendant's bed watching television. The victim explained that the baby was "against the wall, and [the defendant] was in the middle, and I was on the edge." Because the victim was experiencing a backache and because she considered the defendant to be "a father figure" to her, the defendant offered to rub the victim's back, and the victim agreed.

The victim explained that she was lying on her side and that she was wearing "Sponge Bob" fluffy pajama bottoms and a t-shirt. While the defendant was rubbing her back, he unhooked the victim's bra and removed it "[t]hrough the sleeves" of her t-shirt. The victim stated that she "was scared." The defendant then rolled the victim onto her back, pulled her t-shirt up, and began rubbing her breasts. The defendant, who was wearing only gym shorts, then removed the victim's pajama pants and underwear and knelt on the floor in front of her. The defendant spread the victim's legs apart with his hands and penetrated her vagina with his hands. The defendant then vaginally penetrated the victim with his tongue, and the victim could feel that the defendant was moving his tongue. The victim attempted to scoot away from the defendant, but the defendant moved with her. The victim testified that she never said anything but stated that she felt scared. The victim estimated that the assault continued for "[a] long amount of time." At some point, the defendant stopped, hugged the victim, told her that he loved her, and laid down beside her on the bed. The victim was able to put her pants back on, but she stayed in the bed with the defendant because she "was scared that if [she] got up, something would happen." The defendant fell asleep, but the victim never did.

The following morning, the victim spoke with her mother and asked if she could go to a friend's house, and the victim's mother consented. While at the victim's friend's house, the friend asked the victim why she "was being weird," at which point the victim revealed to her friend the sexual abuse. The victim then called her mother and told her that the defendant had "touched" her. The victim's mother picked her up from her friend's house and drove the victim to the sheriff's department.

On cross-examination, the victim testified that it was not unusual for her mother or the defendant to rub her back when she was experiencing a backache. When asked why she had not used her cellular telephone to contact the police after the alleged abuse had occurred, the victim responded that she "thought if [she] would have got up that [the defendant] would have done something." The victim admitted that she had lied in the past, that she understood the difference between the truth and lies, and that she understood that "lies have consequences."

Detective Mike Billings with the DeKalb County Sheriff's Department testified

that he was called to investigate a charge of rape of a child filed against the defendant. As part of his investigation, Detective Billings interviewed the defendant. The defendant gave the following statement to Detective Billings:

> Sometime around the end of August, [J.M.L.], [J.L.], and [the victim] had moved into my house . . . because of hard times. I have a large bedroom with two beds and a large TV. It was not unusual . . . for [the victim] to sleep with me and watch TV. On Saturday night, she was hurting in her back, so I rubbed her back until she fell asleep. At one point, the grandbaby who was sleeping with us needed a diaper change, so I got up and changed it around . . . 1:00 a.m. [The victim] got up around 7:30 a.m. and started getting ready for church. The last thing I remember was [the victim] was lying in my arms. I was wearing shorts only, and she had p.j. pants and a tee-shirt.

Detective Billings testified that, at the outset of the interview, he advised the defendant of his constitutional rights, and the defendant signed a waiver of his rights before speaking with the detective. At the conclusion of the interview, Detective Billings told the defendant that he would like to conduct a second interview at a later date. The defendant initially agreed to the second interview, but when the detective contacted him to arrange the interview, the defendant declined, explaining that he would rather not speak with the detective any further.

On cross-examination, Detective Billings acknowledged that he interviewed the defendant without any other officers present, and he testified that the sheriff's department does not record interviews. Detective Billings stated that he had spoken with J.M.L. but that he had not spoken directly to the victim, explaining that the victim's interview had been conducted at "a place in Cookeville" that is "a little more child friendly than sitting inside the jail talking to another man about acts that have happened to her." Detective Billings later reviewed the report compiled by the victim's forensic interviewer. When asked if he had ever stated that he "believed something happened, but that it wasn't how [the victim] described it," Detective Billings replied that he had not and that he "believe[d] [the victim] a hundred percent."

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant elected not to testify but did choose to present proof.

A.A.S. testified that both the defendant and the victim were her cousins. A.A.S. stated that she had last seen the victim in 2010 and that the victim had lied to her in

-4-

the past. A.A.S. testified that she was comfortable around the defendant and that she did not feel threatened when she was in his presence. On cross-examination, A.A.S. admitted that she did not know the victim very well and had only seen her "[t]wo or three times."

Based on this evidence, the jury convicted the defendant of the lesser included offense of aggravated sexual battery. Following a sentencing hearing, the trial court imposed a sentence of eight years and six months. Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying his motions to introduce evidence pursuant to Tennessee Rule of Evidence 412 and to order production of the victim's educational records. In addition, the defendant contends that the evidence adduced at trial was insufficient to support his conviction. We consider each claim in turn.

*I. Tennessee Rule of Evidence 412*

The defendant first contends that the trial court erred by denying his motion to present evidence of alleged instances of the victim's prior sexual conduct. We disagree.

Prior to trial, the defendant moved for permission to present at trial records from the Child Advocacy Center in which the victim allegedly disclosed sexual contact with "other young men," claiming that the records were admissible under Tennessee Rule of Evidence 412 to establish that the young victim's knowledge of sexual matters came from an incident other than the one involving the defendant. The trial court denied the motion, deeming the records inadmissible under the terms of Rule 412 and finding that "12-year-olds, and younger, even" have heard sexual phrases "from other sources." The defendant did not attempt to make an offer of proof, and the alleged document from the Child Advocacy Center was not made part of the record on appeal.

The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). If the appellant fails to file an adequate record, this court must presume the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Because the defendant failed to include the documentation that formed the basis for his motion, we must presume that the ruling of the trial court relative to his request was correct.

## II. Victim's Educational Records

Next, the defendant argues that the trial court erred by denying his request for the production of the victim's educational and disciplinary records. We disagree.

Before trial, the defendant sought production of the victim's educational records, arguing that he was entitled to the records to determine whether "any disciplinary actions, expulsions, or any other relevant information could possibly be used for impeachment." Concerned that the defendant was merely seeking to conduct a fishing expedition, the trial court questioned whether the defendant had any basis for his request. The defendant responded that "he ha[d] heard rumors through the grapevine" that "there ha[d] been incidents . . . of lying in the past." The defendant, however, was unaware whether the alleged lies had been told to teachers, principals, or anyone else. The trial court denied the defendant's motion, finding "there is nothing that would indicate that there's anything [of consequence] in . . . the educational records," and the trial court encouraged the defendant to use cross-examination as his "avenue of pursuit."

Questions concerning the admissibility of evidence challenged as irrelevant rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We find no abuse of discretion in the trial court's denial of the defendant's request. The defendant's vague assertion that the victim was rumored to have lied to school staff or administrators in the past certainly does not meet the requirements of relevancy, particularly when the victim's education was in no way tied to the crime at issue. As noted

by the trial court, the defendant was free to cross-examine the victim about her veracity, and the defendant did so. The trial court did not err by refusing to admit the victim's educational records.

## III. Sufficiency

Finally, the defendant contends that the evidence adduced at trial was insufficient to support his conviction. Again, we disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Aggravated sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . The victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Finally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

The defendant bases his claim of insufficient evidence solely on the credibility, or lack thereof, of the victim. As we have previously stated – and as the defendant himself conceded in his brief before this court – questions concerning witness credibility are resolved by the trier of fact, *see Cabbage*, 571 S.W.2d at 835, and we will not re-weigh such evidence

on appeal, *see Dorantes*, 331 S.W.3d at 379.

Furthermore, the evidence adduced at trial established that the 12-year-old victim trusted the defendant, her uncle, whom she considered to be a "father figure," to rub her aching back, and the defendant responded by removing the victim's clothing, rubbing her breasts, and penetrating her vagina with both his hands and his tongue. Without question, such actions are more than sufficient to "be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6).

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence overwhelmingly supports the defendant's conviction of aggravated sexual battery.

*IV. Conclusion*

In light of the foregoing analysis, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE